Good morning. May it please the Court. Davina Chen for Ricardo Frutos-Lopez. On September 19, 2006, an Article III judge held that Mr. Frutos-Lopez's prior removal violated his constitutional rights to due process. One week later, that order was entered and an indictment was dismissed. Three days later, Mr. Frutos-Lopez was deported without any further hearing. In its brief, the government proffers with apparent approval that this is the routine practice. That when an Article III judge determines that a removal would violate an alien's constitutional right to due process, that the routine practice is to simply deport the alien. Not only is that proffer directly contrary to the only discussion of what the routine practice is in the record, but I submit that it betrays I understand what routine practice has to do with anything. The district judge in Nevada had before him a motion to dismiss the indictment, which he granted. And that's all that he did. He did his order. He was not asked to, and he did not, in his judgment, order the prior removal order vacated, even if he had jurisdiction to do it, which I would submit he didn't. Your Honor, what he did was that he determined that the prior removal order violated Mr. Frutos-Lopez. Therefore, that indictment could not stand. Your Honor, I would submit that Congress knows how to limit the effects of a collateral attack. For instance, in the context of a 921, a misdemeanor, what is it, in possession of a firearm. They very clearly state that you can contest the existence or the validity of that prior conviction, but the only effect it has is that it cannot be used in the criminal proceedings. Similarly, in the context of an 851, Congress clearly states that the effect of challenging the validity of your prior drug conviction is that it can't be used to increase your sentence. In fact, in Mendoza-Lopez, the Supreme Court used very clear language. It said in Mendoza-Lopez that what you could challenge is, I'm sorry, I can't find it over here, a collateral challenge to the use of a deportation proceeding as an element of a criminal offense. But that's not the language that Congress used in 1326D. Counsel, let me just take a step back and see if I can track your argument. The district court in Nevada said that your client's constitutional rights were violated. And some long period of time passes, and another district court is faced with the question that is similar, but why isn't that a question of law rather than a question of fact? And with regard to a question of law, there was an intervening change that showed that the Nevada court was, in fact, incorrect in its legal analysis. What's wrong with that construct? Well, let me step back. What's happening here in the central district of California is not so much that Mr. Dorey, that's the trial attorney, excuse me, was asking the court to determine was what effect did the district of Nevada's determination have? Well, the actual effect it had was to dismiss the indictment. But if the legal analysis that underlay that was wrong due to a change in law, I don't understand why the government would be as stopped the way it would if there were a fact finding. For example, is the question whether the person was carrying a gun and there's a hearing in the finding no gun. And maybe the government can't relitigate that. But I think I have two answers. And let me give the long answer first because I think it's the answer that you're trying to, you're struggling with. And that is the change of law exception is not nearly as broad as the government makes it out to be. I think that the two cases that I cited in terms of the change of law exception are Moser, which is a Supreme Court case. It's a seminal collateral estoppel case. And Morgan, which is a recent Federal Circuit case. And, of course, the Federal Circuit has many opportunities to determine collateral estoppel against the government cases. In Moser, the question, whether you want to call it a question of law or application of law to fact, the question at issue in Moser was whether a naval cadet, a naval officer's period as a cadet counted as naval service. And in between the time that he had his first decision and the Moser case in the Supreme Court, the law had, in fact, changed. But the Supreme Court said, well, gee, collateral estoppel would mean nothing if we would be, if we were to say that the thing adjudged, the thing adjudged will stand, but the underlying basis will not. And so in Moser, very clearly, the law had changed. And yet collateral estoppel applied. I think Morgan is even more clear because in Morgan, the issue at hand was whether an individual's disclosure subjected him to whistleblower protection. And in between the time he made his first claim and his second claim, the law had changed. And everyone conceded that by the time the second claim came along, those disclosures he had made would not be considered protected disclosures under the Whistleblower Protection Act. But the Federal Circuit said, we cannot construe the change of law exception that broadly. We have to balance interests. And I think the change of law exception really is not about has the law changed, but to balance the interests. In this case, Mr. Frutos-Lopez's reliance interest was extremely strong. The government says that it's strange credulity that he believed that the 1326d motion did anything, but Judge Collins believed it. And Judge Collins is not a credulous judge. She said, I believe it. I believe that Mr. Frutos-Lopez probably didn't know he was doing anything wrong when he came back in the country because he had just had this experience that an Article III judge, a district judge, had said that his removal violated due process. And she granted a departure on that basis. So the reliance interest of Mr. Frutos-Lopez is extremely strong, whereas the reliance interest of the government is weak in this case because there is not one. I submit that there is no similarly situated person. I have never had a case where this sort of thing happened. So from the government's perspective, I take it your view is they just have to start another deportation proceeding, do it right, and then all is well. Yes, exactly. And the reason why I said I had two answers and I was going to give a long one first and a short one second is that the reason I think and that's the change of law, is a red herring, is that the government's position is regardless of whether Judge Mann's determination was correct or incorrect, it should have no effect in immigration proceedings. It's clear that that's their position because they drop in a footnote where they say there was no reason for us to appeal Judge Mann's determination because it was correct. But it can't have any effect. How can a district court order affect a final order of removal? It can't. There's no connection. The dots don't connect. You can only appeal a removal order to a court of appeals, not to a district court. Well, 8 U.S.C. 132060 talks about a collateral attack and an underlying deportation. And I submit that it is very rational for Congress to believe that an article 3 judge's determination should have some effect. So this is not the case of somebody who is indeed protected. Well, it did have a significant effect. It got him off the hook of something under of a hook on which he otherwise would have been caught. I mean, that's quite significant. He avoided prosecution. But it seems to me a separation of powers argument to say that ICE is allowed to deport people after an article 3 judge has already found the deportation order is invalid. We couldn't even decide that in this case. We don't have ICE in front of us. All we can do is to decide this case and the district court's order in this case. And I — absolutely. And I would submit that when Congress passed 8 U.S.C. 132060, they used their language carefully. They did not say an alien may challenge the use of their deportation order in criminal proceedings. They said that an alien may challenge the validity of an underlying deportation order. And when an article 3 judge has made a determination that a deportation order is invalid, I don't see how ICE can just pick the person up and deport them based on that deportation order. Do you want to save some time? Yes, Your Honor. Mr. Jenkins. May it please the Court, Matt Jenkins on behalf of the United States. And I believe the Court's already gained traction in most of the government's positions. And just to briefly respond to some of the defense's questions. I have a question that I'd appreciate your addressing. And that has to do with how we interpret 8 U.S.C. section 1326D, which says that an alien may not challenge the validity of a deportation order in a criminal proceeding unless, and the unless things don't apply here. Correct. And my question is, what does it mean to challenge the validity? What does it mean to have a collateral attack? Does that apply? Let me just tell you what's bothering me. Maybe rather than frame it as a question, it seems to me quite clear that if there had never been any proceeding previously concerning the validity of this order, this defendant couldn't start one. But there already was a proceeding in which there was a judicial ruling that the order was invalid. And in that situation, does this section prohibit bringing in that completed adjudication on a question of law into the court also? I'm not really articulating it very well, but it seems to me different to have a whole new procedure as sort of trial within a trial here versus bringing in an order in a previous case. Bringing in the district court's order back from Nevada into our case? Yeah. I'm asking really a statutory construction question. Are they just trying to avoid the trial within the trial, or are they saying no matter what kind of previous decisions there are already made that have become final, we ignore them? I believe it's more the former. They're trying to avoid that in this instance. And then the difference here is we're not in the same procedural posture because there is a new crime that had occurred after the defendant was illegally reentered the second time. So a new crime developed out of that, and that is the basis for this charge. And now it's just like the... Well, it's a new crime if he was validly deported. It all comes back to the same question, which is whether he was validly deported the first time. And I don't understand. I mean, under your theory, no matter if 15 judges, 15 times, had said this was not a valid deportation, it was not a valid deportation, and had said it over and over again, you could keep doing it over and over again rather than just starting over and having a new deportation proceeding, and that troubles me. Well, I believe in this case it's different because DeWayne's algorithm made it clear that the deportation proceeding operated exactly as it should have, and that the Nevada court's order was wrong. And so it was wrong then, and it's certainly wrong now. But if it was wrong then, your job was, as the government, not you personally, was to appeal it. And if a judgment is wrong and there's no appeal, you normally have to live with the consequences, pay the judgment or do whatever it is that the court's decision says. And I believe that's exactly what happened in Nevada, and would have happened except the defendant committed a new crime after he was deported and came back. We're not trying to reopen that Nevada decision. We're not trying to re-litigate the 2006 decision. So was he actually deported again? He was deported, I believe she said, defense counsel, three days later. So he was deported again after the dismissal in 2006. Then he illegally returned. So you're relying not on the original deportation anyway. Is that what you're saying? That is correct. The original order we are relying on, but it's a second deportation and then that subsequent return, which is a whole new crime in and of itself. Okay. So you're saying he did get a second deportation. Correct. Just be sure you're on the same track. I'm not sure. I think Judge Greenberg is talking about deportation. You did rely on the original order of removal to deport him the second time. Yeah. It's the same removal order. Right. And then the second physical deportation. So, okay. I still have the same worry because if normally when the government loses a case and it becomes final, the government has to live with whatever that ruling was with respect to that litigant, whether it's to pay a money judgment or to do whatever. And I understand that in the Nevada case the result was dismissal of an indictment and not anything to explicitly undo the order of removal. And so I guess I'm still struggling with why you wouldn't have to get a new order of removal. Is this a question of law? To bring our case? Why would we have to get a new order of removal? Yeah. Because in our opinion, when we brought our 1326 case in 2008, the law was clear that, in fact, that removal order back in 2001 was perfectly valid and operated just as due process required. Okay. Well, let's take a normal civil case where the government is ordered to pay a money judgment for, say, malpractice at the VA hospital or something. Because this is a civil case. The deportation part is a civil case. And the government doesn't appeal and hasn't yet paid the judgment, but it's final. And a couple years later there's new law that says, oh, wow, we should have realized that that order was wrong. We should never have had to pay this money. That kind of doesn't matter. Aren't you stuck in that situation in a civil context? I think in that situation we would be. And I think what's different. So what's different? He committed a new crime by after being deported returning again. If he had never been deported or in the absence of memory. It's circular because the deportation isn't valid if the order of removal isn't valid, is it? Or is it? It is in this case because the invalidation that we're talking about is the district court's ruling in the 1326 that it felt that the removal proceeding was invalid. It could say the word invalid, but it didn't invalidate the removal order. That can only be done through the immigration court, which, as Ron mentioned, is there's separate proceedings. So the defendant's remedy has to be through the immigration court if he wants to undo the removal order itself. That would then subsequently bar other 1326s on that removal order. But just because the Nevada district court said, hey, I think that due process violation made your removal order invalid, that's all it did was dismiss the 1326. From that point on, the defendant wasn't done if he wanted to actually invalidate the removal order such as it couldn't be used again. And that remedy has to be through the immigration court. That's how Congress designed it. And that's how 1326d is written. And Mendoza-Lopez, the Supreme Court case, which we maintain 1326 codified, exactly contemplated this situation when it states that a successful collateral challenge does nothing to delay the deportation proceeding. The deportation proceeding goes on, unfettered, unless actions are taken within that immigration court to actually to stop, vacate, or stay that removal order. And we believe that is an important basis for this, is keeping the separate jurisdictions separate. And I think Congress intended it that way, and that's how it's operated in our experience. And I believe the question was asked what defense counsel wanted, what the remedy would be, is to, I think she said, go back to immigration court and do it all over. The problem with that is, at this point, to do it all over, it would operate exactly as it did the first time. Defendant is an aggravated felon. He's not entitled to any forms of relief. Therefore, he would be deported. The law is clear on that. So to return to start all over to the point where we're just returning to the same thing that already happened does not seem to be a remedy that's required in this case. And we're running low on time, so if the Court has any questions on the other issues that were raised. Otherwise, I'll submit and ask that the district court's decision to deny the motion dismissed as well as affirm the conviction and sentence in this case. Thank you. Okay. Thank you, Mr. Jenkins. Ms. Chang. I think I only have 30 seconds. If they do it all over again, he gets deported and he comes back and they can charge him again because now they have a valid deportation order and a valid removal. But what happened the first time around is that they just deported him without all that. And what, you know, I misstated something in my brief. CERT was granted in Dueñas Alvarez the very day that Judge Madd's order became final. So the government should have been on notice that they could appeal it. In fact, they might win. They chose not to. They chose simply to remove Mr. Frutos Lopez from the country. And I don't know what collateral estoppel means, if it means that the government can deliberately bypass its opportunity to appeal, especially when it certainly wouldn't have been fruitless because the Supreme Court had already granted CERT in Dueñas Alvarez. They can just bypass that opportunity and then relitigate the issue the second time. I'm not sure what collateral estoppel means. Okay. Thank you, Ms. Chang. Counsel, the matter just argued will be submitted and the Court will stand in recess for the day.
judges: Rymer, Graber, Bea